**Case No. 24-1975**

_____

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

ELIZABETH KERWIN, Regional Director Seventh Region of the
National Relations Board on behalf of National Labor Relations
Board,

                                 Petitioner-Appellee,

v.

TRINITY HEALTH GRAND HAVEN HOSPITAL,

                                 Respondent-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION
Honorable Robert J. Jonker
CIVIL ACTION NO. 24-cv-00445

_____

## RESPONDENT-APPELLANT TRINITY HEALTH GRAND HAVEN HOSPITAL'S MOTION TO STAY THE DISTRICT COURT'S OCTOBER 25, 2024 ORDER PENDING APPEAL

_____

Brian D. Shekell
Richard W. Fanning, Jr.
Clark Hill PLC
500 Woodward Ave., Suite 3500
Detroit, MI  48226
(313) 965-8300
Attorneys for Respondent-Appellant

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 26.1 and 6 Cir. R. 26.1, Respondent-Appellant, Trinity Health Grand Haven Hospital, makes the following disclosures:

1.　　Is said party a subsidiary or affiliate of a publicly-owned corporation?

　　No.

2.　　Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

　　No.

Respectfully submitted,

*s/Richard W. Fanning, Jr.*
Brian D. Shekell
Richard W. Fanning, Jr.
Clark Hill PLC
500 Woodward Ave., Suite 3500
Detroit, MI  48226
(313) 965-8300

Date:  December 13, 2024

i

## <u>INTRODUCTION AND REQUEST FOR RELIEF</u>

Respondent-Appellant, Trinity Health Grand Haven Hospital ("THGH") by and through its attorneys, Clark Hill PLC, pursuant to Federal Rule of Appellate Procedure 8, hereby moves to stay pending appeal of the District Court's order ("Order") granting Petitioner-Appellee Elizabeth K. Kerwin's request for injunctive relief under Section 10(j), 29 U.S.C. 160(j), of the National Labor Relations Act ("the Act") 29 U.S.C. 151, *et seq.*

On September 28, 2023, THGH received a disaffection petition signed by a majority of employees in a bargaining unit at the hospital. That petition stated that the employees no longer wished to be represented by SEIU Healthcare Michigan ("the Union"). Thus, under applicable law, THGH lawfully withdrew recognition from the Union.

The Union then filed a series of unfair labor practice charges which were tried before an Administrative Law Judge ("the ALJ") employed by the National Labor Relations Board ("the NLRB") over an eight-day hearing, between April 3 and May 15, 2024. (R. 12). The ALJ issued his decision on September 6, 2024. (R. 56-1, PageID 3039-3108). THGH and the Counsel for General Counsel of the National Labor Relations filed exceptions to the ALJ's decision which are pending before the Board.

Petitioner commenced this action on April 30, 2024 seeking injunctive relief for the pendency of the administrative proceedings.  Petitioner sought relief which included an interim order requiring THGH to recognize and bargain with the Union, despite the wishes of the employees.  The Order granted that relief, effectively setting aside THGH's lawful action and the wishes of the employees in the bargaining unit.  The Order also required THGH to take certain other actions, including posting and distributing copies of the Order and the submission of an affidavit of compliance.  (R. 69, PageID 3250-52).

THGH is in compliance with the Order and submitted an affidavit of compliance.  (R. 77).  Nevertheless, this Court should stay the Order so that while this appeal is pending, THGH is not required to recognize and bargain with a labor organization that lacks the majority support of the employees.

THGH sought a stay from the District Court (R. 71), which was denied.  (R. 71). In doing so, the District Court simply relied upon its Order while noting that the factors at issue are the same for an injunction as well as for a stay. The District Court got it wrong in both instances.

## FACTUAL BACKGROUND

THGH refers the Court to the *Factual Background* set forth in its Corrected Response to Petitioner Elizabeth Kerwin's Petition for Injunctive Relief. (R. 24,

PageID 2421). In addition, THGH provides the below summary for the Court's convenience.

The North Ottawa Community Hospital ("NOCH") was founded in 1919. NOCH was acquired by Trinity Health effective October 1, 2022 and became THGH. (R. 12, PageID 2020). THGH is a mid- to small-sized community hospital located in Grand Haven, Michigan and is rated as a level four (the lowest level) trauma center. (R. 12, PageID 2018-2019). It has an average daily census of less than twenty-five patients and specializes in day-to-day health issues of members of the Grand Haven community. (R. 12, PageID 2019).

The bargaining unit at issue here was formerly represented by the North Ottawa Community Hospital Employees' Association ("NOCHEA"). In November of 2022, THGH was informed that NOCHEA's board met with the Union. (R. 12, PageID 2031). THGH was later told there had been an "election" which the Union had won. (*Id.*) At that time, the Union did not provide any materials from the NLRB concerning its status. (R. 12, PageID 2035).

In the spring of 2023, the employees in the bargaining unit independently began a petition to decertify the Union as their exclusive bargaining representative when two employees initiated a conversation with THGH's Chief Nursing Officer, Cynthia Van Kampen, and asked how they could remove the Union. (R. 12, PageID 1644, 1657). Jamie Quinn, a non-supervisory employee in the bargaining unit,

quickly took the lead in gathering signatures. (R. 12, PageID 1995-1997, 2001). Quinn testified she did not receive any assistance from anyone in supervision or management of THGH or Trinity Health. (R. 12, PageID 1997, 2006). Quinn testified that she informed employees who signed the petition about its purpose and why she was seeking to remove the Union. (R. 12, PageID 2000-2001, 2015). She also testified that she showed, and even read, the language at the top of the petition to everyone who signed, even if they did not sign the first page of the petition. (R. 12, PageID 2000, 2015). An employee named Samantha Justian also assisted in gathering signatures.  (R. 12, PageID 2116).

Quinn gathered enough signatures and filed a decertification petition with the NLRB. (R. 24-4, PageID 2469-2479). The Petitioner accepted the petition and the parties entered into a Stipulated Election Agreement whereby a decertification election was held on September 18 and 19, 2023. (R. 2-3, PageID 62-66).  The Agreement stated votes were to be tallied "immediately upon conclusion of the last voting session" on September 19, 2023. (R. 2-3, PageID 65). The election was then held and, without any prior notice to THGH, the NLRB elections officer announced the votes would not be counted. Rather, he ordered the ballots to be impounded. (R. 12, PageID 1859-1860). THGH eventually learned the Charging Party had requested the Petitioner block the counting of the ballots.

4

Quinn testified that the Charging Party's gamesmanship in blocking the tally of the votes upset employees in the bargaining unit. (R. 12, PageID 2005, 2011). Employees then came to her seeking to sign the petition because of the Union's tactics. (R. 12, PageID 2005). As such, Quinn continued to gather additional signatures on the same petition. (R. 12, PageID 2005). Eventually, Quinn gathered signatures from over 50% of the bargaining unit and submitted that document, now referred to as a "disaffection petition," to the hospital's President Shelleye Yaklin on September 28, 2023. (R. 12, PageID 2005, 2065-2066).

Yaklin testified that she reviewed the disaffection petition on September 28, 2023 to make sure that the classifications held by those who signed the petition were in the bargaining unit. (R. 12, PageID 1274-1275). Though she did not individually verify each of the signatures, Yaklin was supported by the human resources department at the hospital, as well as extensive human resources capabilities within the corporate structure of Trinity Health. (R. 12, PageID 2028). She forwarded the petition to Gengle, as well as to Human Resources at Trinity Health. (R. 12, PageID 2066). THGH verified that the disaffection petition contained a sufficient number of signatures from employees in the bargaining unit to justify the withdrawal of recognition. (R. 12, PageID 2066). As such, THGH withdrew recognition from the Charging Party.

Yaklin also testified about a document that the employer was required to produce to the NLRB and the Charging Party immediately prior to the September 18 and 19 election. (R. 24-10, PageID 2498-2504). That document listed the members in the bargaining unit at the time the document was created. (*Id.*). Yaklin then testified as to certain changes that needed to be made to reflect employees who had joined or left the bargaining unit in the intervening time before the withdrawal of recognition, and to correct errors in the original list. (R. 12, PageID 2080-2084). When updated in light of Yaklin's testimony, the list shows 177 employees were in the bargaining unit as of September 18, 2024. The employee disaffection petition contained sufficient names from that list to constitute actual evidence of a withdrawal of recognition. (*Id*).

The Union withdrew its objections to the counting of the votes in the decertification election. Those votes were counted on September 29, 2023—the day after THGH received the disaffection petition. The Union prevailed in that election.

## <u>LEGAL ARGUMENT</u>

### A.    LEGAL STANDARD

To determine whether to grant a motion to stay, courts consider: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir.

6

2020). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." (*Id.*)

"An application [for a stay of injunction pending appeal] necessarily goes to the discretion of the court." Wright, Miller, & Kane, Federal Practice and Procedure, § 2904 (2d ed. 2004).

## B.     THGH IS LIKELY TO SUCCEED ON THE MERITS OF ITS APPEAL

A movant can demonstrate a likelihood of success on the merits by showing there are "serious questions going to the merits." *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016).  In *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024), the Supreme Court held that relief is only appropriate under Section 10(j) where a petitioner <u>proves</u> through a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm; (3) balancing the countervailing harm to the employer; and (4) whether the public interest would be served by granting an injunction. In this case, Petitioner did not make a "clear showing" for the requested relief and, at a minimum, this factor therefore inures to entering a stay.

### 1.     Petitioner Failed To Demonstrate She Was Likely To Succeed On The Merits Of The Underlying Action.

#### a.     Petitioner's arguments concerning the validity of the disaffection petition were insufficient to demonstrate a likelihood of success on the merits.

It is well settled that an employer who receives objective evidence that a union has lost the support of the majority of the employees in a given bargaining unit may

7

lawfully withdraw recognition. *Levitz Furniture Co. of the Pacific, Inc.,* 313 NLRB 717 (2001) *overruled on other grounds Johnson Controls, Inc.*, 368 NLRB No. 20 (2019), *N.L.R.B. v. B.A. Mullican Lumber & Mfg. Co.*, 535 F3d 271 (4th Cir. 2008). That is precisely what happened in this case. Further, both the NLRB and the courts have found that a petition signed by a majority of employees stating they no longer wish to be represented by a union constitutes objective evidence of a loss of majority support. *Levitz Furniture*, at 725; *N.L.R.B. v. B.A. Mullican Lumber & Mfg. Co.*, 535 F3d 271 (4th Cir. 2008). Notably, the necessary evidence of a loss of majority support need not be unambiguous. The employer only needs to show "it is more probable than not that a majority of employees rejected union representation." *Diversicare Leasing Corp.*, 351 NLRB 817, 818 (2007).

Before the District Court, Petitioner presented a series of procedural hurdles to the validity of the employee disaffection petition. First, Petitioner argued that the disaffection petition was invalid because the signatures were not individually dated; however, the authority cited by Petitioner does not show any requirement that the signatures be dated. In *Guerdon Industries*, 218 NLRB 658, 661 (1975), the Board accepted testimony that outlined the timeframe in which the petition was circulated instead of demanding specific dates for each signature. *Id.* at 659. Further, *Metal Sales Mfg.,* 310 NLRB 597 (1993) involved a *decertification* petition that needed to be filed within a narrow window before the expiration of a collective bargaining

agreement. The specific date that signatures were gathered was therefore determinative. That is not the case here.

Moreover, the record clearly establishes the time frame in which the signatures were gathered. Van Kampen testified that two employees came to her asking how to remove the Charging Party in the spring of 2023. (R. 12, PageID 1657). Though Quinn testified she could not recall the exact date she began to collect signatures, when asked whether it was in April, she said "I would say more May-ish, but possible." (R. 12, PageID 2007-09). Another employee also testified that she signed the disaffection petition on September 28, 2023. (R. 12, PageID 1501). On this same date, the disaffection petition was sent to Yaklin. Thus, the disaffection petition was circulated, and signatures were collected, between mid-May and September 28, 2023.

Second, Petitioner argued that the disaffection petition was invalid because the signatories were not informed of its purpose. But, again, the record evidence demonstrates that this is not true. Quinn informed employees who signed the petition about its purpose and why she was seeking to remove the Union. (R. 12, PageID 2000-01, 2015). She showed, and at times even read, the language at the top of the petition to everyone who signed. She did this even if the individual did not sign the first page of the petition. (R. 12, PageID 2000, 2015). Samantha Justian also testified that she helped gather signatures and took similar steps while doing so. (R. 12, Page-

9

ID 2116). Indeed, one of the witnesses called by the Counsel for NLRB's General Counsel at the administrative hearing admitted that Quinn told a group of employees that the petition was "to get us out of the union." (R. 12, PageID 1405-06). Thus, the record shows that each employee who signed the Petition was informed of its purpose.

Third, Petitioner argued that the disaffection petition was not sufficiently verified and authenticated to constitute objective evidence of employee disaffection with the Union and that certain signatures were illegible. Petitioner's claim, again, is not supported by the record. Yaklin was able to identify the signatures questioned in the proceedings before the ALJ. (R. 12, PageID 1279-80, 2084). What is more, Yaklin testified that she reviewed the disaffection petition on September 28, 2023 to make sure that the classifications listed were in the bargaining unit. (R. 12, PageID 1274-75). She then forwarded it to the Hospital's Human Resources Director, Timothy Gengle, and to Trinity Health's Human Resources Department so they could verity the signatures. (*Id.*)

Finally, but perhaps most telling, Petitioner accepted the document in the context of a decertification election and did not claim that the signatures on the document were defective until THGH relied upon them as objective evidence that the employees no longer supported the Union. In fact, the disaffection petition has more signatures on pages that contain the petition language that the prior version

that was accepted as sufficient evidence to support the decertification petition. (R. 2-11, PageID 149, 151-152).

**b.    Petitioner's reliance upon the Decertification Election did not demonstrate a likelihood of success on the merits.**

Petitioner, and the District Court, also relied upon the decertification election. However, that election does not provide a basis for the conclusion that Petitioner was likely to succeed on the merits with respect to the underlying action. To support this argument, Petitioner cited to *Brooks v. Nat'l Lab. Rels. Bd.*, 348 U.S. 96, 103, 75 S. Ct. 176, 181, 99 L. Ed. 125 (1954); *Alta Vista Regional Hospital*, 356 NLRB 1331 (2011); and *Cmty. Support Network & Serv. Emps. Int'l Union Loc. 1021*, 363 NLRB 833 (2016). (R. 2, PageID 48- 49). But these cases are not applicable. Indeed, the only relevant language in *Cmty. Support Network & Serv. Emps. Int'l Union Loc. 1021*, 363 NLRB 833 (2016) and *Alta Vista Regional Hospital*, 356 NLRB 1331 (2011) is dicta as those cases were decided on procedural issues which are not even claimed to be present in this case.

Further, *Brooks* and *Cmty. Support Network* are distinguishable. In *Brooks*, the employer received a petition indicating loss of majority support for a union after an election *and after the votes were tallied*. Similarly, in *Cmty. Support Network* the disaffection petition was received by the employer two months after the tally of votes. Here, THGH received the disaffection petition before the tally of votes and before any action by the NLRB to proclaim a winner in the election. This is

11

significant because it negates any inference that THGH gathered signatures to overturn an adverse vote tally before the NLRB could issue a formal certification. Moreover, THGH filed both objections and a request to review with the NLRB, further distinguishing the present action from the cases cited by Petitioner.

### 2.  Petitioner Failed To Make A Clear Showing Of Irreparable Harm Absent An Order Of Injunctive Relief.

Before the District Court, Petitioner simply relied upon possible loss of union support to demonstrate irreparable harm. However, this is insufficient as Petitioner was required to make a clear showing that this matter "present[ed] one of those rare situations in which the delay inherent in completing the adjudicatory process [would] frustrate the Board's ability to remedy the alleged unfair labor practices." *McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1123 (8th Cir. 2015). Petitioner did not satisfy this heavy burden.

The disaffection petition itself makes clear that the Union had fallen out of favor with a majority of the bargaining unit employees before THGH withdrew representation. To refute this claim, Petitioner produced so-called "impact evidence" concerning attendance at the Union's meeting. The "impact evidence" actually confirmed that there was no material decline in attendance at Union meetings. (R. 2-15, PageID162). It showed that even at its thirty-person height, only 17% of the group attended Union meetings. The document also showed attendance had begun to decline **before** THGH withdrew recognition. At the September 11, 2023, meeting,

12

attendance had declined to sixteen people and on September 11, September 21, 2023, to just nine employees. At a meeting held on October 3, 2023, after THGH withdrew recognition, employee attendance **_increased_** to twenty-three. (R. 2-15, PageID 162).

Petitioner also submitted the Affidavit of Ricky Kauffman in an attempt to demonstrate loss of Union support. (R. 2-16, PageID 163-67). Kauffman's Affidavit contained speculative evidence as to why employees allegedly felt a certain way or took certain actions. Put simply, no competent evidence was provided by Petitioner to make the required "clear showing" that a loss of Union support was likely in the absence of the extraordinary relief sought in the Petition. This showing may not be presumed in-line with the Supreme Court's decision in *Starbucks Corp. v. McKinney*, 144 S. Ct. at 1576. However, the record does not support a finding or an inference that Petitioner made the clear showing required by *McKinney*.

Petitioner likewise failed to prove that injunctive relief was necessary to maintain the status quo pending the Board's final Order, another consideration when evaluating whether injunctive relief is necessary to prevent irreparable harm. *McKinney ex rel. N.L.R.B. v. S. Bakeries, LLC*, 786 F.3d 1119, 1123 (8th Cir. 2015).

Finally, a Regional Director's delay in requesting interim injunctive relief may be considered in this context and should have been dispositive here. *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 964–65 (9th Cir. 2010) (affirming the district court's conclusion that there was "little basis to believe, given the long delay,

13

that an interim order . . . [would] provide any genuine reassurance to employees beyond that provided by a final Board order that unfair labor practices committed by [Respondent would] be timely remedied"). Petitioner waited seven months after the filing of the charge to request injunctive relief. (R. 24, PageID 2454).

### 3.    Petitioner Failed To Demonstrate That The Balance Of The Harms Was In Her Favor.

Petitioner did not make an adequate showing that the balance of the harms weighed in favor of granting injunctive relief. John Foss, THGH's Vice President of Operations, provided a Declaration to the District Court that the culture within THGH, employee morale, and overall communication by and between employees, managers and supervisors improved since the withdrawal of Union recognition. (R. 46-5, PageID 2946-2950).  These improvements will likely be upended by the confusion employees will experience if they are forced back to the bargaining table. (*Id.*)

Avoiding such an unsettling result is especially important given that Respondent is a Community Hospital with only 400 employees. (R. 12, PageID 2018-19). THGH's leadership and management team is already stretched thin. THGH cannot afford for them to be away from their duties to negotiate with a union the employees do not want over an agreement that may very well be set aside by the final result of the administrative process. (R. 46-5, PageID 2946-2950).

Moreover, the Hospital's retention rate may decline if THGH is required to bargain with the Union on an interim basis, resulting in yet another hurdle to THGH's ability to provide adequate patient care. This is especially so given that THGH has been required to implement quarterly adjustments to many employees' rates of pay to keep up with market conditions. (R. 46-5, PageID 2946-2950). These adjustments are driven by a market analysis directed by the Hospital's Compensation Team and a need to retain employees. (*Id.*) If Respondent is required to bargain pending the Board's final Order, it will no longer be able to implement these quarterly adjustments as it determines.

Notably, courts within the Sixth Circuit have held that patient care and safety is a "reasonable issue . . . to emphasize." *Sumner v. Beaumont Health Sys.*, No. 20-13163, 2022 WL 1322850, at *12 (E.D. Mich. May 3, 2022). Indeed, patient care and safety is a characteristic specific to health care institutions and must be considered critically by this Court. *Frye v. District 1199, Health Care and Social Services Union, AFL-CIO*, 996 F.2d 141 (6th Cir. 1993). Patient care concerns alone are reason enough to tip the scales in Respondent's favor with respect to the balance of the harms.

In contrast to the very real concerns raised by Respondent with respect to an award of injunctive relief, Petitioner relied upon the same evidence as under the irreparable harm factor. As noted above, her proof was insufficient. Accordingly,

15

when balancing the harms to THGH's employees against that of Respondent in the event a stay is not granted, Respondent's ability to meet patient needs and to foster a supportive environment to boost employee morale is paramount.

### 4. Petitioner Did Not Demonstrate That Injunctive Relief Was In The Public Interest.

An award of interim injunctive relief is not necessary to protect the integrity of the collective bargaining process in this case because any relief granted by this Court would simply provide the same relief that the Board may or may not provide at a later date. For this reason, an order of interim relief would actually erode the core principle that employees are free to accept or reject representation by forcing them to recognize the Union even after a majority declined to do so.  29 U.S.C. § 157.

Here, a majority of the employees unequivocally expressed that they no longer wish to be represented by the Union in the disaffection petition submitted on September 28, 2023.  The record is clear that this decision came only after a series of strategic decisions by the Union that caused employees to become dissatisfied with its gamesmanship. (*See* R. 12, PageID 1699, 1956-57, 1701-1703, 1859). Forcing THGH to recognize and bargain with a Union the employees themselves do not want through interim relief does not further the public purpose of preserving the integrity of the collective bargaining process. Such a result is inequitable.

Petitioner failed to prove by a clear showing under any of the four elements needed to justify an injunction under Section 10(j) of the Act.  Thus, THGH is clearly likely to succeed on the merits of its appeal and the District Court abused its discretion in not recognizing as much when denying a stay pending appeal.

## C.   THGH WILL SUFFER IRREPARABLE HARM IF A STAY IS NOT GRANTED

THGH will suffer irreparable harm absent a stay. Patient care and employee morale will suffer significantly if THGH is forced to recognize and bargain with the Union, only for such Order to be later overturned by the Board, resulting in uncertainty and confusion. On this point, THGH incorporates its arguments in Section B(3), *supra*, as well as those addressed in THGH's Supplemental Response to Petitioner's Petition for Injunctive Relief.  (R. 46).

## D.   THE BALANCE OF THE HARMS AND THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING A STAY

Based on the District's Court's Order, THGH will be forced to recognize and bargain with the Union, despite the wishes of its employees, only to experience more uncertainty and confusion in the event the Board later rules in favor of Respondent. This, in turn, may lead to employee turnover that negatively impacts patient care. *See* Section B(4), *supra*.  This is contrary to the public interest of employee free choice under the Act.  29 U.S.C. § 157; *Levitz, supra.*  In contrast, Petitioner has failed to show any unlawful action by THGH or any impact upon the Union.  Thus, the balance of the harms and the public interest support the issuance of a stay.

17

## <u>CONCLUSION AND RELIEF REQUESTED</u>

For the foregoing reasons, THGH respectfully requests that the Court grant

this motion, and stay the District Court's Order pending appeal.

Respectfully submitted,

Dated: December 13, 2024.

*s/Richard W. Fanning, Jr.*
Brian D. Shekell (P75327)
Richard W. Fanning, Jr. (P55697)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
(313) 965-8300
bshekell@clarkhill.com
rfanning@clarkhill.com
Attorneys for Respondent-Appellant

18

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 27(d )(2) because brief contains 4115 words, excluding parts of the brief exempted by Fed. R. App. P. (32)(f). This document complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Dated: December 13, 2024.                    Respectfully submitted,

*s/Richard W. Fanning, Jr.*
Brian D. Shekell (P75327)
Richard W. Fanning, Jr. (P55697)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
(313) 965-8300
bshekell@clarkhill.com
rfanning@clarkhill.com
Attorneys for Respondent-Appellant

## CERTIFICATE OF SERVICE

The undersigned certifies that she electronically filed the foregoing document with the clerk using the Court's Electronic Filing System on December 13, 2024, which will send notification of such filing to all parties and/or attorneys of record.

| _____ U.S. Mail | _____ Facsimile |
|---|---|
| __X____ E-Filing | _____ Hand Delivery |
| _____ E-Mail | _____ Federal Express |

*s/Dina Griffey*
CLARK HILL PLC

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH KERWIN, Regional Director,
Seventh Region of the National Labor
Relations Board, for an on behalf of the
NATIONAL LABOR RELATIONS BOARD,

       Petitioner,

                                CASE NO. 1:24-cv-445

v.

                                HON. ROBERT J. JONKER

TRINITY HEALTH GRAND HAVEN HOSPITAL,

       Respondent.
_____/

## ORDER DENYING MOTION TO STAY

The matter is before the Court on Respondent's Motion to Stay this Court's October 25, 2024, Order granting Petitioner's request for Section 10(j) relief. (ECF No. 71). Petitioner has filed a brief in opposition to the motion (ECF No. 75) and the matter is ready for decision. For the reasons that follow, the motion is denied.

FED. R. CIV. P. 62(d) and FED. R. APP. P. 8(a) permit a district court to stay an injunction while the opposing party appeals from the decision. In determining whether a stay should be granted courts "consider the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). These factors are: (1) the likelihood of the moving party's success on the merits; (2) the likelihood that the moving party will be irreparably injured absent a stay; (3) the risk that granting a stay will injure others; and (4) the public interest in granting the stay. *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (quoting *Michigan Coalition of Radioactive Material Users, Inc.*, 945 F.2d at 153). "These

factors are not prerequisites that must be met but are interrelated considerations that must be balanced together." *Michigan Coalition of Radioactive Material Users, Inc.*, 945 F.2d at 153

In this case, a stay is not warranted. As all sides recognize, the factors the Court considers here are those the Court already considered in determining whether to issue the Section 10(j) Order. The Court finds no reason for rebalancing those factors here. *See* Order, *Yapp USA Automotive Sys. Inc. v. NLRB*, No. 24-12173 (E.D. Mich. Sept. 13, 2024) (in examining motion to stay, noting the earlier analysis of the first two factors applies with equal force to motion to stay). To the extent there is anything different to consider, such as an injury to other parties from the issuance of the stay, the Court finds nothing to disturb things. To the contrary, the importance of requiring the defendant to honor the agreed result in favor of the union of an admittedly fair election grows with each passing day. And for this reason, Respondent's alternative request for a 30-day pause is unpersuasive.

**ACCORDINGLY, IT IS ORDERED** that Respondent's Motion to Stay (ECF No. 71) is **DENIED.**

Dated:   November 14, 2024        /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   UNITED STATES DISTRICT JUDGE

# EXHIBIT B

EXHIBIT D

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ELIZABETH KERWIN, Regional Director Seventh
Region of the National Labor Relations Board, for
and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

                         Petitioner,

v.

TRINITY HEALTH GRAND HAVEN HOSPITAL,

                         Respondent.

Case No. 1:24-cv-00445
Hon. ROBERT J. JONKER

---

Patricia A. Fedewa (P51964)
National Labor Relations Board (Detroit)
Region 7
477 Michigan Ave., Room 300
Detroit, MI 48226-2569
(313) 226-3236
patricia.fedewa@nlrb.gov

Steven E. Carlson (P58196)
National Labor Relations Board, Region 7
Gerald R. Ford Federal Building
110 Michigan St., NW, Room 299
Grand Rapids, MI 49503
(616) 930-9160
steven.carlson@NLRB.gov

Attorneys for Petitioner

Brian D. Shekell (P75327)
Richard W. Fanning, Jr. (P55697)
Lauren M. Smith (P87377)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
(313) 965-8300
bshekell@clarkhill.com
rfanning@clarkhill.com
lmsmith@clarkhill.com

Attorneys for Respondent

---

## DECLARATION OF JOHN T. FOSS

I, John T. Foss, swear, depose, and state that I have personal knowledge of the facts stated in this Declaration; that I am not disqualified from being a witness in this matter; and, if called as a witness, I could competently testify to the following facts based upon my personal knowledge:

1.      I have been employed by the Trinity Health System since May of 1994. I am familiar with the Trinity facilities in West Michigan, including Trinity Health Grand Haven Hospital ("Hospital"). My role at Trinity includes that of the Vice President of Operations for the Hospital.

2.      I began my role as Vice President of Operations for the Hospital when its President, Shelleye Yaklin, retired in the Spring of 2024.

3.      As the Vice President of Operations, I am responsible for overseeing the daily operations of the Hospital. These duties include employee issues such as staffing and morale, as well as patient care. I regularly conduct rounds at the Hospital where I observe Hospital operations and interact with Hospital employees.

4.      The Hospital has experienced improvements in its workplace culture and communications since recognition was withdrawn from SEIU Healthcare Michigan ("the Union").

5.      I believe that the operations of the Hospital, employee morale and patient care will be harmed if the Hospital is ordered to recognize and bargain with the Union, particularly on an interim basis pending a final decision from the National Labor Relations Board process.

6.      The Hospital's leadership and managerial team is thinly staffed and faces many challenges. The Hospital would necessarily have to assign members of that group to attend bargaining sessions which would result from an interim order to recognize and bargain with the Union. I expect these sessions would last several hours over multiple days and weeks. The overall operations of the Hospital would be negatively impacted, and, more importantly, patient care

2

would suffer, from the need to pull members of the leadership and managerial team away from their duties.

7.      In addition to patient care, an order for the Hospital to recognize and bargain with the Union before the National Labor Relations Board process can produce a final decision will adversely impact employee morale.  I understand that many employees signed a petition stating that they did want the Union to represent them.  An order restoring the Union before a final decision would promote uncertainty, confusion, and anxiety among the employees and adversely impact operations and patient care.

8.      Since at least the Spring of 2024, the Hospital has worked to foster an environment of open communication between Hospital employees, supervisors, and managers.  This has resulted in an improved sense of trust and communication between the employees and the Hospital.

9.      For example, the Hospital employs an "open door policy" that has prompted three to four employees per week to approach me to voluntarily state that they do not want the Union to return to the Hospital. These statements began in the Spring of 2024 and have continued until the date of this Declaration.

10.     More recently, in July of 2024, the Hospital conducted a "Pulse Survey" of its employees which centered on employee engagement. That survey received a high-level of response, garnering a response from more than 70% of Hospital employees.  This level of response shows an eagerness on the part of the employees to directly communicate with the Hospital's leadership team.

11.     The Hospital has additionally implemented monthly Town Hall meetings, along with an Idea Board where employees can share their thoughts on how the Hospital can improve with its operations.

12.     An interim order requiring recognition of, and bargaining with, the Union would undermine, and likely stop, the positive changes listed above because the Union would likely insert itself into the communication between the Hospital and its employees.  This would adversely impact Hospital operations and patient care.

13.     In the 2023-2024 Fiscal Year, the Hospital began to implement quarterly, market-driven adjustments to the rate of pay for many, if not most, positions within the Hospital.  These increases were based upon updated market analysis conducted by the Trinity Health System's Compensation Team. The frequency of these market adjustments has been necessary to adjust to the changes in the level of compensation prevailing in the relevant market and to preserve employee retention.  I understand that the Hospital could be required to cease or delay these adjustments if it is ordered to recognize the Union.

14.     The Hospital's retention rate is likely to decline if it is no longer able to timely implement quarterly market adjustments on an as needed basis while bargaining with the Union. An increase in employee attrition will adversely impact not only the remaining employees, but the patients served by the Hospital.

I declare under penalty of perjury that the foregoing is true and accurate, pursuant to 28 U.S.C. § 1746.

_____
John T. Foss

Date: August 9, 2024

4