## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ELIZABETH KERWIN, Regional Director of Region 7
of the National Labor Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

       Petitioner-Appellee,

    v.                                     No. 24-1975

TRINITY HEALTH GRAND HAVEN HOSPITAL,

       Respondent-Appellant.

## NATIONAL LABOR RELATIONS BOARD'S OPPOSITION TO
## TRINITY HEALTH GRAND HAVEN HOSPITAL'S MOTION FOR STAY

Petitioner-Appellee Elizabeth Kerwin, Regional Director of Region 7

("Director" or "Petitioner") of the National Labor Relations Board ("the NLRB" or

"the Board") opposes the motion of Trinity Health Grand Haven Hospital

("Trinity") for a stay pending appeal of the temporary injunction issued by the U.S.

District Court for the Western District of Michigan on October 25, 2024, under

Section 10(j) of the National Labor Relations Act, 29 U.S.C. 160(j) ("the Act").

The order requires Trinity to, *inter alia*, immediately recognize, and upon request,

bargain in good faith with SEIU Healthcare Michigan ("Union"), who represents a

Unit of its employees;[1] post and distribute copies of the injunction order; and cease its illegal conduct. (R. 69)[2]

# I. INTRODUCTION

The district court properly exercised its discretion in issuing an injunction because it applied the appropriate legal standard to well-supported facts, as discussed below. Under Section 7 of the Act, 29 U.S.C. § 157, employees have the right to join a union of their choosing. Once a union has been certified as the employees' chosen collective-bargaining representative, the Act requires an employer to recognize and bargain with the union in good faith. Trinity trampled on its employees' rights when it withdrew recognition from the Union pending the results of the NLRB election it agreed to abide by without any objective evidence that a majority of employees no longer wished to be represented, in violation of Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5).

As the district court properly recognized, injunctive relief is necessary to protect the employees' Section 7 rights, safeguard the bargaining process, preserve the remedial power of the Board, effectuate the will of Congress, and ensure that

[1] The Unit consists of about 182 various technologists, assistants, technicians, aides and other lab, medical, pharmacological, administrative, clerical, housekeeping, custodial, and social worker employees.

[2] The district court record will be noted as "R." followed by the ECF docket number and PageID number where appropriate.

Trinity does not profit from its illegal conduct. Because a stay of the order works to thwart those critical ends, the Court should deny Trinity's motion.

## II. STANDARD FOR A STAY PENDING APPEAL

To obtain a stay of the injunction pending appeal, Trinity must show: (1) a strong likelihood that it will prevail on the merits of its appeal; (2) that it will suffer irreparable injury if the stay is denied; (3) that the other party will not be substantially harmed if the stay is granted; and (4) that the stay will serve the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *See Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977). As discussed below, Trinity does not meet this standard.

## III.   TRINITY HAS NOT SHOWN IT IS LIKELY TO PREVAIL ON APPEAL

To prevail on appeal, Trinity must establish that the district court applied an erroneous legal standard or made clearly erroneous findings of fact or that it abused its discretion in granting interim relief. *Small v. Avanti Health Sys.*, LLC, 661 F.3d 1180, 1186-87 (9th Cir. 2011); *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1030 (2d Cir. 1980). Here, Trinity has not—and cannot—do so.

### A. The District Court Correctly Found the Director is Likely to Succeed on the Merits Showing Trinity Violated Section 8(a)(5) of the Act as alleged

The facts are largely undisputed. In October 2022, Trinity Health, a nationwide healthcare company with over 100 facilities and 121,000 employees,

acquired the North Ottawa Community Hospital and renamed it Trinity Health
Grand Haven Hospital ("Trinity"). (R. 56-1, PageID.3041) Trinity has around 350-
400 employees; as the North Ottawa Community Hospital, the facility historically
maintained positive labor relations with two labor unions: the Michigan Nurses
Association and the North Ottawa Community Hospital Employees Association
(NOCHEA). (R. 56-1, PageID.3041, 3043) At that time, the NOCHEA and Trinity
had been parties to a collective-bargaining agreement that expired on June 30,
2022. (R. 56-1, PageID.3043) On November 3, 2022, NOCHEA voted to affiliate
with SEIU Healthcare Michigan (the "Union"). (R. 56-1, PageID.3044) On
November 30, 2022, the Union and Trinity signed a Memorandum of
Understanding that extended the parties' expired collective-bargaining agreement
until February 28, 2023. (R. 56-1, PageID.3046-47) The parties began negotiating
a successor collective-bargaining agreement in January 2023. (R. 56-1,
PageID.3047)

In April 2023, during the course of the successor collective-bargaining
negotiations, some employees began a decertification campaign; on July 31, 2023,
an employee filed a decertification petition with the Board (R. 56-1, PageID.3056-
3057, 3060) On August 31, 2023, a binding stipulated election agreement was
entered into by Trinity and the Union, and approved by the Director, for an
election to be conducted by the NLRB to determine whether a majority of Unit

employees wished to retain the Union as their bargaining representative. (R. 56-1, PageID.3066) Pursuant to this written agreement, the NLRB conducted said election on September 18 and 19, 2023. (*Id*.) Trinity did not allege anything untoward in how the election was conducted. (R. 15-13, PageID.2238-39)

Before the ballots were counted on September 29, 2023, showing that the Union won by a clear margin,[3] Trinity revoked recognition from the Union the day prior, September 28, 2023, based on a purported "disaffection petition" consisting of seven pages it received from an employee that day. (R. 56-1, PageID.3068-69, 3087) None of the pages nor the 94 signatures are dated; three of the pages do not bear any language identifying them as part of a disaffection petition, including one page with numbering that is non-contiguous with the other pages. (*Id*.) Further, the disaffection petition included 10 signatures without printed names, some of which were illegible, and one printed name without an accompanying signature. (*Id*.) The employee did not provide Trinity with any kind of affidavit laying the foundation for the collection of these signatures at the time she presented Trinity with the petition, nor did Trinity attempt to investigate or resolve any of these defects, nor ascertain whether the signers were even current employees in the Unit. (*Id*.)

---

[3] Of approximately 182 eligible voters, 89 cast ballots for the Union, 66 cast ballots against, and 7 cast non-determinative challenged ballots. (R. 2-4, PageID.67)

Instead, Trinity relied on this unverified and defective disaffection petition as its justification to withdraw recognition from the Union and disregarded the pending election proceedings to which it had agreed. (*Id*.)

After the Union won the NLRB-supervised secret ballot election, Trinity filed a Request for Review and Motion for Stay of Proceedings with the Board, and on December 7, 2023 the Board denied both, agreeing with the Director that Trinity's objections failed to allege objectionable conduct by any party at the relevant time, i.e., prior to or during the election. (R. 56-1, PageID.3070) 2023 WL 8472740 (Dec. 7, 2023) (unpublished Board order).

On January 5, 2024, the Director issued a Complaint, and then subsequently issued a Consolidated Complaint on January 29, 2024, based on certain unfair labor practice charges filed by the Union against Trinity. The administrative hearing began on April 3, 2024 and continued over eight days. (R. 56-1, PageID.3039)

On April 30, 2024, the Director filed with the District Court a Petition under Section 10(j) of the Act 29 U.S.C. §160(j) seeking a preliminary injunction pending final resolution of the underlying administrative case to prevent Trinity from persisting in conduct alleged to have violated the Act, thereby frustrating its remedial purposes. (R. 1)

On September 6, 2024, the administrative law judge ("ALJ") issued his decision finding, *inter alia*, that the disaffection petition did not provide objective evidence of the Union's loss of majority support. (R. 56-1, PageID.3087-88) The ALJ noted the numerous defects with the petition, which had not been authenticated, and additionally concluded that Trinity would not have been privileged to withdraw recognition even absent any defects given that the petition was preceded by months of unfair labor practices, including Trinity's bad faith bargaining, disparagement of the Union, and threats to employees, which tainted the petition. (*Id.*) More importantly, the ALJ concluded that Trinity's reliance on the petition was impermissible where the election already occurred, as secret ballot elections are the preferred way to resolve questions regarding employees' support for unions, and an alleged post-election loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election. (*Id.*) Petitioner subsequently advised the district court of the ALJ's decision. (R. 56, 56-1)

On October 25, 2024, the district court issued its Opinion and Order granting the injunction after consideration of the pleadings, evidence, briefs, arguments of counsel, and the entire record, finding that Petitioner made a clear showing under the standards articulated in *Starbucks Corp. v. McKinney,* 144 S. Ct. 1570, 1576 (2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008))

that Trinity has engaged in, and is engaging in, acts and conduct in violation of Section 8(a)(1) and (5) of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act, and that such acts and conduct will likely continue unless enjoined. (R. 68, 69) As the district court put it, "That election happened. No one is challenging its fairness. And no one contests its outcome in favor of the union." (R. 68, PageID.3242) "In the [district c]ourt's mind, having agreed to hold an election and having agreed it was fair, [Trinity] must live with the result. Instead, [Trinity] has sought to undermine the vote based on signatures they gathered before, during, and after, the actual election. This undermines the integrity of the election process and the result. Put differently, Petitioner has demonstrated a strong likelihood of success…" (R. 68, PageID.3240)

### i. Trinity violated Section 8(a)(5) when it withdrew recognition from the Union pending the results of the properly conducted NLRB election

An employer violates Section 8(a)(5) of the Act if it relies upon a disaffection petition to withdraw recognition from an incumbent union after the election has already taken place. *Brooks v. NLRB*, 348 U.S. 96, 97, 103-04 (1954). Indeed, "an alleged postelection loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election." *Alta Vista Regional Hospital*, 356 NLRB 1331, 1332-33 (2011), *enfd*. 697 F.3d 1181, 1187 (D.C. Cir. 2012) (post-election assertion that

a union has lost majority support has no bearing on the validity of an election that has already occurred). *See also Macy's Inc.*, 361 NLRB 1490, 1490 (2015), *enfd.* 824 F.3d 557 (5th Cir. 2016); *Kane Co.*, 145 NLRB 1068, 1070-71 (1964), *enfd.* 352 F.2d 511 (6th Cir. 1965); *Johnson Controls Inc.*, 368 NLRB No. 20, slip op. at 10 n.46 (2019) ("we adhere to extant precedent that an alleged post-election loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election").

Moreover, while election proceedings are underway, an incumbent union remains the bargaining representative, and the employer's bargaining obligation continues. *Levitz Furniture Co. of the Pac., Inc.*, 333 NLRB 717, 727 (2001); *Frankl v. HTH Corp., (Frankl II)*, 693 F.3d 1051, 1060 (9th Cir. 2012).

The district court correctly applied these principles in finding the Director clearly demonstrated a likelihood of success that on September 28, 2023, Trinity unlawfully withdrew recognition from the Union after the election it agreed to was properly conducted. *See NLRB v. Galicks, Inc.*, 671 F.3d 602, 610 (6th Cir. 2012) (once employees have chosen to be represented by a labor organization, "[a]n employer violates Sections 8(a)(5) and 8(a)(1) of the Act by 'refusing to bargain collectively with the representative of its employees,' . . . which includes unilaterally withdrawing recognition from a union supported by a majority of the bargaining unit's members"); *Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952,

959-60 (6th Cir. 2006) (an employer may only withdraw recognition absent other unlawful conduct, "where the union has actually lost the support of the majority of the bargaining unit employees"); *NLRB v. Hollaender Mfg. Co.*, 942 F.2d 321, 327-28 (6th Cir. 1991); *Glasser v. Heartland–Univ. of Livonia, MI, LLC*, 632 F. Supp. 2d 659, 670 (E.D. Mich. 2009) (granting interim bargaining order under Section 10(j) where employer's unlawful assistance to antiunion petition precluded it from relying on that petition to withdraw recognition from incumbent union). The district court also correctly noted that an "election process that tests whether a majority of the unit employees actually does, or does not, wish to be represented by a particular union protects employee free choice in the best possible way." (R. 68, PageID.3243)

While Trinity is therefore legally precluded from relying on the disaffection petition, in any event the district court correctly agreed with the Director that the petition still would not have constituted "objective evidence" that the Union had lost majority support "by a preponderance" given its numerous defects, including that three of the pages contained no heading or other language identifying them as part of a disaffection petition or any purpose at all; and Trinity did not authenticate the petition before relying on it to withdraw recognition.[4] (R. 68, PageID.3243)

---

[4] Despite Trinity's assertion in its Stay Motion that President Shelleye Yaklin ("Yaklin") supported by the human resources department verified that there were sufficient signatures *before* withdrawing recognition, the record does not support

*Levitz*, 333 NLRB at 723, 725; *see also Wyman Gordon*, 368 NLRB No. 150, slip

op. at 9 (2019) (Board held that because the majority of the signatures were on

pages that "do not state the petition's purpose or a request" for the employer to

take action, those signatures could not meet the burden of proving majority support

was in fact lost), *enfd.* 836 Fed. Appx. 1, 10 (D.C. Cir. 2020); *Pacific Coast

Supply, LLC v. NLRB*, 801 F.3d 321, 351 (D.C. Cir. 2015) (employer failed to

prove actual loss of majority because four of the employees' written statements

were ambiguous as to whether they sought to renounce their union membership or

their union representation), *enforcing sub nom. Anderson Lumber Co.*, 360 NLRB

538, 542 (2014).

Although Trinity attempts to argue that some context clues and vague

testimony elicited before the administrative law judge six months later was

sufficient to authenticate the petition and fill in any gaps, the district court

correctly rejected this argument, as the operative date for determining whether

---

such a claim. In fact, the ALJ specifically rejected such posturing, instead finding
that Yaklin "moved quickly to withdraw recognition without knowing whether
everyone on the petition was eligible to be counted as a bargaining unit employee.
She had no personal knowledge as to where she got the 180 total from and
speculated that it was "probably" from "the HR department." Nor did Yaklin know
when the signatures were collected. She knew only some of the names on the
petition and did not authenticate the information to determine if those who signed
were still employed." (R. 56-1, PageID.3068 fn.129; R. 12, PageID.1272-76, 1279-
80, 2066-67)

there is objective evidence of a lack of majority support is the date an employer's withdrawal of recognition becomes effective. *See HQM of Bayside, LLC*, 348 NLRB 758 (2006), *enf'd*, 518 F.3d 256 (4th Cir. 2008); *Wyman Gordon*, 368 NLRB No. 150, slip op. at 9, n.21 (noting evidence regarding level of employee support for union adduced during ALJ hearing irrelevant to whether employer had objective evidence of loss of majority support at the time it withdrew recognition), *Highlands Regional Medical Center*, 347 NLRB 1404, 1407 n.17 (2006), *enfd. sub nom. Highlands Hospital Corp. v. NLRB*, 508 F.3d 28 (D.C. Cir. 2007) (same). The unreliability and insufficiency of Trinity's evidence was further laid bare the day after the withdrawal of recognition by the tally of votes proving that a majority of employees in fact still desired the Union as their collective-bargaining representative. (R. 56-1, PageID.3069)

Further, the authority cited by Trinity in its Stay Motion regarding the lack of dates accompanying the signatures is inapplicable as *Guerdon Industries*, 218 NLRB 658, 659 (1975), was decided under *Celanese Corporation of America*, 95 NLRB 664 (1951)—the old standard by which the Board determined whether an employer's withdrawal of recognition from an incumbent union in a particular case is permissible. However, *Levitz Furniture Co. of the Pac., Inc.*, 333 NLRB 717 (2001) overruled *Celanese* and other decisions that allowed employers to withdraw recognition merely by establishing a good-faith reasonable doubt as to unions'

majority support. Under *Levitz*, an employer must show that the union has *actually lost* the support of a majority of the bargaining unit employees. 333 NLRB at 717. Even if the old standard still applied, *Guerdon* would still be irrelevant as the Board there held that the employer's withdrawal was unsanctioned as it was not done "in a context free of unfair labor practices" as is the situation here as well. 218 NLRB at 660.

Trinity's reliance on *Metal Sales Mfg.,* 310 NLRB 597 (1993) is also misplaced. Signatures must be dated or the party submitting them may establish the dates via affidavit. *Dart Container Corp.*, 294 NLRB 798, 798 (1989). The affidavit itself must be timely, and in *Metal Sales*, the Board stated that this requirement is satisfied if the affidavit is filed within a "reasonable time" after the timely filed signature list, and finding six working-days to constitute such. 310 NLRB at 598. The reason for some latitude in that scenario is because a party filing with the NLRB merely initiates the administrative processing and preliminary investigation of a petition, and if said party fails to provide dated signatures or an affidavit within a reasonable time, the petition can simply be administratively dismissed. *NLRB Case Handling Manual Section 11011* (When a petition does not meet the test of sufficiency for any reason, the petitioner is requested to withdraw the petition; if this is not done within a reasonable time, the petition is administratively dismissed.) However, in the context of a withdrawal of

recognition, no latitude is allowed because an employer must show *at the time it withdrew recognition* that the union has actually lost majority support. *Levitz*, 333 NLRB at 717. Here, Trinity did not attempt to authenticate the petition until the administrative trial almost six months after its reliance on the petition, meaning it failed to secure any objective evidence of an actual loss of majority support at the time of its withdrawal of recognition.

Trinity's attempt to distinguish *Brooks v. NLRB*, 348 U.S. 96 (1954), and *Community Support Network & Serv. Emps. Int'l Union Loc. 1021*, 363 NLRB 833 (2016) is also misguided. In *Brooks*, the Supreme Court affirmed the Board's finding that an employer violated Section 8(a)(5) by refusing to bargain with a union because it received a disaffection petition signed by a majority of employees one week after a representation election and tally, but a day before the union was certified as their exclusive bargaining representative. 348 U.S. at 97-98, 103-04. In *Community Support Network*, the Board found that an employer violated Section 8(a)(5) by refusing to recognize and bargain with a union because the employer had received a disaffection petition signed by a majority of employees after the representation election, tally, certification of representative. 363 NLRB at 833. In its Stay Motion, Trinity contends that unlike in those case, it withdrew recognition *before* the tally of votes and therefore was not trying to steal the election. But that distinction is irrelevant. When the tally of ballots occurs is immaterial if the

election eventually results in a certification of representative. *Brooks* 348 U.S. at 98. As courts have repeatedly said, *supra*, an alleged post-election loss of majority support is not relevant to the question of whether a union should be certified as the result of a properly conducted Board election.

## B. The District Court Correctly Balanced the Harms and the Public Interest in Favor of Injunctive Relief

### i. Trinity's misconduct threatens irreparable harm to its employees' Section 7 rights, collective bargaining, and the Board's ultimate remedial authority

The district court correctly noted that this Court and others have held that establishing a likelihood of success on an unlawful refusal to bargain in good faith generally establishes likely irreparable harm. (R. 68, PageID.3244-45) *See Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993); *Glasser v. Precision Gage-Dearborn, LLC*, 2003 WL 22140116, at *7-*8 (E.D. Mich. Jan. 27, 2003); *Levine*, 465 F. Supp. at 694; *see also Frankl I*, 650 F.3d at 1362 (failure to bargain in good faith "has long been understood as likely causing an irreparable injury to union representation"); *Small*, 661 F.3d at 1191 ("Given the central importance of collective bargaining to the cause of industrial peace, when the Director establishes a likelihood of success on a failure to bargain in good faith claim, that failure to bargain will likely cause a myriad of irreparable harms").

Absent an injunction, Trinity's refusal to recognize and bargain with the Union threatens to irreparably undermine employee support for the Union and the efficacy of the Board's final bargaining order. *See*, *e.g.*, *Peters v. NLRB*, 153 F.3d 289, 299-300 (6th Cir. 1998) (refusal to bargain "'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.'") (quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 49-50 (1987). *Cf. NLRB v. Am. Nat'l Ins. Co.*, 343 U.S. 395, 402 (1952) ("Enforcement of the obligation to bargain collectively is crucial to the statutory scheme.").Without prompt recognition and bargaining, the employees' support for their chosen representative will predictably erode as the Union is unable to adequately protect them or affect their working conditions through collective bargaining during the period that the case is pending before the Board. *See NLRB v. Aquabrom, Div. of Great Lakes Chemical Corp.*, 855 F.2d 1174, 1185 (6th Cir. 1988) (refusal to bargain results in "inevitable erosion" of union support and "employee disenchantment with the dormant status of its elected bargaining representative"); *Frye*, 10 F.3d at 1226-27 (quoting *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454-55 (1st Cir. 1990)).

Worsening loss of support for the Union over time will, in turn, make the final Board order meaningless because an incumbent union needs the support of

the employees it represents in order to bargain effectively. *See Merrill & Ring, Inc.*, 262 NLRB 393, 395 (1982), *enforced*, 731 F.2d 605 (9th Cir. 1984) ("[t]here is no clearer or more effective way to erode the ability of the Union to bargain for the employees than for Respondent to make such changes without consultation with the Union"); *I.U.O.E. v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("[w]hen the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees"). By the time the Board issues its final bargaining order, it will be too late to protect employee choice and for the Union to regain lost support. *See Frye*, 10 F.3d at 1226-27 (if union support allowed to continue to erode, Board order to bargain will be a nullity); *Calatrello v. Carriage Inn of Cadiz*, 2006 WL 3230778, at *7-*8 (S.D. Ohio Nov. 6, 2006); *Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio 1979), *aff'd in rel. part,* 610 F.2d 432, 436-37 (6th Cir. 1979). Thus, absent an injunction, meaningful collective bargaining after a final Board decision will be impossible and the Board's final bargaining order will be ineffective. *See Frye*, 10 F.3d at 1226-27 ("There was a very real danger that if [the employer] continued to withhold recognition from the [u]nion, employee support would erode to such an extent that the [u]nion could no longer represent those employees. At that point, any final remedy which the Board could impose would be ineffective.") (quoting *Centro Medico*, 900 F.2d at 454).

Here, the district court's conclusion that Trinity's unlawful withdrawal of recognition will likely cause irreparable harm is supported by record evidence of employee disaffection from the Union, including evidence that employee attendance and participation in Union activities and meetings was immediately chilled following Trinity's public withdrawal of recognition. (R. 68, PageID.3245)

### ii. There is no harm to Trinity from the interim injunction

In contrast to the harms to employee collective-bargaining rights and to the Board's remedial authority described above, there is no irreparable harm to Trinity from the injunction. The district court correctly found that the risk of harm is insubstantial to Trinity in comparison to the likely harm to the Union, employees, and Board's remedial authority absent an injunction. (R. 68, PageID.3247) The court was "not convinced…by the parade of horribles presented by [Trinity]" — i.e., that patient care and employee morale would be compromised if Trinity is ordered to bargain collectively, and that requiring Union recognition would negatively impact its ability to provide pay increases to the Unit employees. (R. 68, PageID.3246-47) These claims are baseless. This Unit has been represented for decades and Trinity has bargained with its representatives without any adverse impact to employee morale or patient care. Moreover, courts have consistently found that interim injunctions in the healthcare setting do not pose risks to patient safety. *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 239 (6th Cir. 2003) (interim

injunction requiring reinstatement of unlawfully terminated nurses did not pose risk to patient care where reason for terminations was completely unrelated to patient care issues); *Lightner v. 1621 Route 22 West Operating Co. d/b/a Somerset Valley Rehabilitation and Nursing Center*, 2012 WL 1344731, at *51 (D.N.J. April 16, 2012) (*inter alia*, ordering reinstatement of two union leaders in name of "safeguarding the collective bargaining process," rejecting argument their reinstatement would harm patient care), *vacated on other grounds* 729 F.3d 235 (3d Cir. 2013).

Trinity's claims regarding any alleged delay by the Director in filing for injunctive relief are also groundless. The Board must have time to "investigate and deliberate" before initiating Section 10(j) proceedings. *See Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir. 1990) (Board requires time to thoroughly investigate unlawful activity); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539, 544–45 (4th Cir. 2009) ("[c]omplicated labor disputes like this one require time to investigate and litigate"); *Maram v. Universidad Interamericana*, 722 F.2d 953, 960 (1st Cir. 1983) (the Board "cannot operate overnight"). Even with some passage of time, delay is significant only if the harm has occurred and the parties cannot be returned to the status quo that would have existed but for an employer's unlawful conduct, such that a final Board order is likely to be as effective as interim injunctive relief. *See Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750

(9th Cir. 1988), *overruled on other grounds, Miller v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir. 1994) (en banc); *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987). Here, the passage of time (four months from the date the Consolidated Complaint issued to when the Petition for injunctive relief was filed) has not so undermined employee support for the Union that an injunction would be no more effective than a final Board order.

Trinity has proffered *no evidence* that it will suffer *any harm*—much less irreparable harm—if it is ordered to return the lawful status quo of recognizing and bargaining with the Union. An interim bargaining order under Section 10(j) is not permanent. *See Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision"). Trinity maintains that if ordered to bargain, it may not be able to make required quarterly adjustments to many employees' rates of pay to keep up with market conditions, however this claim is unfounded. The order would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations. Rather, it only requires bargaining with the Union in good faith to an agreement or a bona fide impasse. *See Small*, 661 F.3d at 1196 (in the "balance of the equities, when '[t]he company is not compelled to do anything except bargain in good faith,' the risk from a bargaining order is 'minimal.'"). Moreover, it does not require anything that

cannot be undone; any agreement reached between the parties under a Section

10(j) decree can contain a condition subsequent to take into account the possibility

of the Board's ultimate refusal to grant a final bargaining order remedy. *See, e.g.*,

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).

### iii.  The public interest favors injunctive relief

An interim bargaining order will also further the public interest in fostering

collective bargaining to safeguard industrial peace. *See Ford Motor Co. v. NLRB*,

441 U.S. 488, 499 (1979) ("National labor policy contemplates … collective

bargaining. … this is preferable to allowing recurring disputes to fester outside the

negotiation process until strikes or other forms of economic warfare occur.").

Additionally, it will serve the public interest in "ensur[ing] that an unfair labor

practice will not succeed" because of the long administrative process. *Small*, 661

F.3d at 1197 (quoting *Frankl I*, 650 F.3d at 1365-66). *See also Seeler*, 517 F.2d at

39 (the public interest is in "prevent[ing] frustration of the purposes of the Act").

### IV.    THE SAME BALANCE OF HARMS AND THE PUBLIC INTEREST THAT SUPPORTS THE INJUNCTION WEIGHS AGAINST A STAY

A stay of the preliminary injunction would permit Trinity to continue to

flout its bargaining obligation, demonstrating to its employees that their Union is

powerless to protect their interests. Staying the injunction would therefore allow

further loss of support for the Union, which could be stemmed by the injunction, to

build up over time. It would also, once again, leave the employees with the irreparable loss of the benefits of collective bargaining pending the appeal. *See Small*, 661 F.3d at 1191-92 (loss of collective bargaining benefits is irreparable harm). These harms, in turn, would threaten the effectiveness of the Board's final remedy, as discussed above, and lessen its ability to preserve employees' Section 7 rights and the Board's remedial authority.

## V. CONCLUSION

For these reasons, Petitioner-Appellee asks the Court to deny Trinity's request for a stay pending appeal.

Respectfully submitted this 20th day of December 2024,

*/s/ Elise F. Oviedo*
ELISE F. OVIEDO,
KYLE A. MOHR
NATIONAL LABOR RELATIONS BOARD
1015 HALF STREET SE
WASHINGTON, DC 20570
elise.oviedo@nlrb.gov / ph: (202) 273-4257
kyle.mohr@nlrb.gov / ph: (202) 273-3812

Attorneys for Petitioner-Appellee,
National Labor Relations Board

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Petitioner-Appellee, furnishes the following in compliance with F.R.A.P. 27(d):

I hereby certify that Petitioner-Appellee's response to Respondent-Appellant's motion conforms to the rules contained in F.R.A.P. 27(d), 32(a)(5), and 32(a)(6). The length of this response, excluding parts exempted by F.R.A.P. (32)(f), is 5,057 words using proportionally spaced 14-point Times New Roman.

## CERTIFICATE OF SERVICE

This certifies that, on December 20, 2024, the Board's Opposition to Motion for Stay was electronically served on all parties via the Court's ECF system.

/s/ Elise F. Oviedo
ELISE F. OVIEDO
NATIONAL LABOR RELATIONS BOARD
1015 HALF STREET SE
WASHINGTON, DC 20570
elise.oviedo@nlrb.gov / ph: (202) 273-4257